Filed 4/11/23  P. v. Perez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ARMANDO MARCELO PEREZ,<br><br>Defendant and Appellant. | F082285<br><br>(Super. Ct. No. F20904606)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Defendant Armando Marcelo Perez and his wife occasionally babysat Y. and her younger brothers.  When Y. was eight years old, she and her brothers stayed at

defendant's house for several days while their parents went on an out-of-town trip. Y. alleged defendant touched her private area, put his fingers in her privates, and licked her private area. Defendant also showed Y. his privates and asked if she wanted to touch him, but she said no.

A jury convicted defendant of sexual penetration of a child who is 10 years of age or younger (Pen. Code, § 288.7, subd. (b); count 1) and oral copulation of a child who is 10 years of age or younger (§ 288.7, subd. (b); count 3). (Undesignated statutory references are to the Penal Code.) Defendant was sentenced to two consecutive terms of 15 years to life, for a total of 30 years to life.

On appeal, defendant raises several claims. First, he contends the child sexual abuse accommodation syndrome (CSAAS) testimony was offered to introduce improper opinions about the victim's credibility and defendant's guilt. Second, defendant contends CALCRIM No. 1193 impermissibly permitted the jury to use the CSAAS evidence to boost the credibility of the victim, thereby reducing the prosecutor's burden of proof. Third, defendant contends his sentence constitutes cruel and unusual punishment in violation of the state and federal Constitutions. Fourth, defendant contends the court's order requiring him to submit to acquired immunodeficiency syndrome (AIDS) antibody tests pursuant to section 1202.1 must be stricken. And last, defendant requests certain clerical errors be corrected in the abstract of judgment and sentencing minute order. The People contend the trial court did not abuse its discretion by admitting CSAAS evidence and the trial court properly issued CALCRIM No. 1193. The People argue defendant's challenge to his sentence as cruel and unusual punishment was forfeited but, irrespective, his sentence comports with both the state and federal Constitutions. The People agree the order requiring AIDS testing must be stricken and the abstract of judgment and the sentencing minute order should be modified.

We agree with the People and order the court to correct the abstract of judgment and minute order as stated below, strike the challenged fees, and strike the AIDS testing requirement. In all other respects, we affirm the judgment.

**FACTUAL BACKGROUND**

*Prosecution evidence*

At the time of trial, Y. was nine years old. She testified she had known defendant since she was a baby. Defendant's wife, Seferina, was "like best friends" with Y.'s mother, C.A.

Y. was about seven years old when she first stayed at defendant's house. Y. would go to defendant's house after school while her mother and father were working. One of her parents would pick her up later in the day. Y. also stayed overnight at defendant's house. Y. testified she stayed there overnight for "ten nights."

When Y. would stay at defendant's house, her two younger brothers, who were four and two years old, also went with her. Defendant's wife and his two daughters, who were 12 and 14 or 15 years old, would also be there. Y. mostly played with her brothers and did not play with defendant's daughters. When Seferina was at home, she would put Y. and her brothers to bed. Y. liked Seferina and said she was nice to her. When Seferina was at work, defendant's daughters, mainly the older one, would help take care of Y. and her brothers by giving them something to eat.

Defendant's house was a one-story house with two bedrooms. Defendant's room had a television and two beds in it. When Y. spent the night at defendant's house, she slept in the "simple" bed in defendant's bedroom, about two to three feet from the bigger bed that defendant and his wife slept in. Y.'s brothers slept in another part of defendant's bedroom that was separated by a curtain. This part of the room had a bunk bed and a "flat bed" where Y.'s brothers slept. It also had a television. Defendant's daughters shared their own room.

3.

Defendant first touched Y. when she was eight years old. Y. testified defendant would "always do the same." Y. explained defendant would touch her body using his two hands and tell her to go to his bed, but she never wanted to. Defendant would open Y's legs and she would get scared. Y. stated defendant would touch the front part of her bottom where girls "go pee." It first happened at night when Y. was in her bed. Defendant was in his bed and his wife was at work. Y. remembered the door to the room was closed and locked. The television was on and Y. was still awake. Y. was wearing pants with underwear but nothing on top. Defendant came over to Y.'s bed, took off her blanket, pulled her pants and underwear down, spread her legs open, and touched her. He touched her privates with one hand using his fingers. Y. described the touching as "hard"; it hurt, and was like defendant was "tapping." Defendant also put his finger inside her privates, and it hurt because he would press it in hard. He did this for about three minutes. Y. said she felt scared when he did this. She would tell him no, but he did not listen. She could not really move because he grabbed her feet. She did not scream because she was afraid. Y. did not tell Seferina because defendant was always around her and she was scared. Y. was also afraid to tell her mom because defendant told her not to and Y. was afraid her mom would hit her. Y. said that "[e]very time [defendant's] wife [was] not there he would touch me." Y. testified, in total, defendant put his fingers in her privates six times. However, at another point, Y. stated defendant put his finger in her private parts "[a]bout every day" and over 10 times.

Defendant also tried to get Y. to touch his privates when he was in his room; this occurred at night when Seferina was at work. Y. was watching television and defendant was changing. Defendant approached Y. in his underwear. He was about four to five feet away when he pulled his underwear down and asked Y. if she wanted to see his privates. Y. said no and did not look at his privates. Defendant put his clothes back on and told Y. not to say anything to her mom because he did not want to be in jail. Y. did not tell anyone because she was scared he would do something else to her, like touch her

4.

more. Defendant only dropped his pants in front of Y. on that one occasion. It made her feel uncomfortable; she did not feel safe.

Defendant never had his shirt on in the house. It would bother Y. because she did not like seeing someone without their clothes. Her brothers never saw defendant touch Y. because defendant would always send them to bed first. When defendant would touch Y., his daughters were in their room; they never tried to come in. Y. never tried to tell defendant's daughters that defendant was touching her because she was scared and she did not think they would believe her. Y. stated she was nervous testifying. She felt shy talking about defendant while he was there in the courtroom.

Y. stated that defendant also licked her privates and she did not like that. She did not remember the first time defendant licked her privates but recalled it happened at defendant's house in his room. Defendant's wife was still at work, his daughters were in their own room, and Y.'s brothers were in bed sleeping. The bedroom door was closed but not locked. Y. said this happened one time. When defendant licked her privates it made her feel uncomfortable like she wanted to escape, but she could not because she was too little. Y. said defendant licked her about five times; the first time it happened for about five seconds and the other times were shorter. He had already taken her pants and underwear off and touched her in her private area before he licked her privates. Y. wanted to tell her parents about it, but she was scared something would happen to her or defendant would accuse her and she would get into trouble. Y. told defendant to stop but he kept doing it. She wanted to cry.

At some point Y. decided to tell her mom because she wanted the touching to stop. After Y. told her mom, Y. did not have to stay at defendant's house anymore. Y. felt scared to tell her mother; her mother was sad after she told her. After Y. told her mom about defendant, Y. also told her dad. Then, the police came to Y.'s house and she spoke with two policemen while her dad was there. Y. cried because she was scared and nervous to answer the questions.

On cross-examination, Y. denied telling Seferina she was sad her parents were fighting. Y. also denied telling Seferina her mom was moving to Mexico and that she wanted to stay with Seferina because she did not want to move to Mexico.

Y.'s mother, C.A., testified she had known defendant and Seferina for about 10 years. C.A. knew Seferina through her husband, who was friends with defendant. C.A. considered Seferina to be a good friend and she trusted both her and defendant. In October of 2019, C.A. went on a trip to Oregon with her husband, Y.'s father, for about 15 days. They left their three children with Seferina and defendant. C.A. came back from Oregon at the end of October to pick up her children. After returning, C.A. did not have her kids stay at defendant's house again. When C.A. spoke with Y. about her time at defendant's house, Y. said everything was going well, everything was good, Seferina was taking care of her well, and that defendant loved her a lot. C.A. did not notice any changes in Y.'s behavior and she continued doing well in school.

Y. did not tell C.A. what defendant did to her until May of 2020. Y. and her brothers were fighting and C.A. said if they kept fighting she was going to drop them off at Seferina and defendant's house. Y. told C.A. she did not want to go there anymore because she was afraid of defendant. When C.A. asked her why she was afraid, Y. told her defendant touched her vagina. She reported he touched it several times and he wanted her to touch his private part but that she did not want to. Y. was nervous and crying while she was telling her mom about it. When C.A. asked Y. why she did not tell her when it happened, Y. said she was afraid her mom would scold her. C.A. said she felt deep pain and was in shock because she trusted defendant. C.A. told her husband and called the doctor the next day. C.A. asked Y. if she was lying, and Y. said "no," she was telling the truth. C.A. said Y. has never lied to her.

C.A. was considering moving to Mexico at the end of 2019 and had a yard sale at defendant's house to sell some items. C.A. was going to Mexico because her father was killed there and she was going to see her mother who was sick and has diabetes. Around

6.

December of 2019 or January of 2020, Y. said she did not want to go to Mexico and she wanted to stay with Seferina and defendant if C.A. went. C.A. said Y. was just playing when she said that and did not really want to stay with them. C.A. stayed because Y. did not want to go to Mexico.

Officers Villalobos and Troy Rodriguez spoke with Y. at her house. Y. told them her parents would take trips out of state and she would stay at defendant's house for about 10 to 15 days. Officer Rodriguez got the impression Y. stayed there more than once. Y. said that, while she was there, defendant would touch her privates and put his fingers in her privates. Y. told the officers defendant would lock himself in the bedroom with her when he touched her, and he sometimes would lick or kiss her privates and she would be scared. Y. also said there was one occasion when defendant showed his penis to her and asked if she wanted to touch it, but she covered her face with a blanket because she was scared. Y. estimated this occurred between May 2019 to December 2019. Y. also said that when defendant and his wife would come over to her house to visit, defendant would stare at her like he liked her, and it would make her feel scared.

Officer Rodriguez also met with defendant and Seferina at their home. He did not interview anyone else because, according to Y., there were no witnesses to the touching incidents.

Detective Richard Figueroa was assigned to the case. Figueroa set up a forensic interview of Y. at the Family Healing Center in Fresno. Figueroa drove Y. and her mother to the interview and was not in the room for the interview, but he was able to watch from a separate room. The video of the interview between Y. and a forensic interviewer was played for the jury.

Detective Figueroa testified a physical exam was not conducted on Y. because too much time had passed since the alleged incidents, and it would not have been possible to obtain evidence at that point; he also did not want to retraumatize the victim. An exam is typically only ordered when it is has been no more than two days since the incident.

7.

California licensed marriage and family therapist David Love testified as an expert for the prosecution. Love is the founder and executive director of Valley Community Counseling Services, a nonprofit children's mental health treatment agency. He teaches for the American Association of Child Abuse and is the lead instructor for the California Child Abuse Training and Technical Assistance Center. Love explained he did not know the facts of this case and was not asked to make a diagnosis. Rather, his role was to explain CSAAS, which "is an explanation of how children often react to being sexually molested and it includes a description of the most typical reactions or behaviors of molested children." He detailed the five most common patterns of behaviors to be secrecy; helplessness; entrapment and accommodation; delayed, conflicted and unconvincing disclosure; and retraction. Love discussed each factor, but noted the factors were not diagnostic of sexual abuse; they did not prove the abuse happened. Rather, he testified, CSAAS provides an explanation for behaviors that may be used as a basis to challenge a child victim's honesty or credibility.

*Defense evidence*

A former neighbor of defendant's testified she had him and his wife babysit her children when she worked. The neighbor has three daughters aged nine, seven, and almost two years old. She recalled seeing Y. and her two brothers at defendant's house on occasion. She has had no reason to believe her children were molested by defendant.

Seferina testified. She referred to defendant as her husband because they lived together. They had been together for about 20 years and have two daughters together. She had known C.A. since Y. was born; C.A. and her husband were living with them. C.A. and her husband moved out when Y. was around five years old. C.A. is godmother to Seferina's youngest daughter.

Seferina started watching C.A.'s children around July of 2019. Around that time, Seferina was working at a restaurant on Thursdays through Sundays from about 4:00 or 5:00 p.m. until 9:00 or 9:30 p.m. She stopped working there in August 2019 when the

8.

restaurant closed. C.A.'s children stayed with them for about six to eight days when C.A. and her husband went to Oregon for work. But Seferina did not remember when they stayed over or if she was working when they were over. Seferina thought they stayed over in July and then another time that she did not recall. She just knew the children were in school when they stayed over. She remembered being home when Y. was dropped off after school, but she also recalled times Y. would be dropped off when she was already at work. She remembered getting home from work and C.A.'s children would still be awake. Seferina would let them watch television for a little while and then put the children to sleep. When Seferina was at work, her daughter was supposed to take care of the children and defendant was only supposed to observe. C.A.'s children slept in a curtained-off area in Seferina and defendant's bedroom. Seferina's daughters shared their own room.

Seferina never saw Y. sad or crying. The only affection she saw defendant show towards Y. was when he would tickle her and she would laugh. Seferina never saw defendant do any of the acts with which he was charged and denied he had any vices. Seferina knew C.A. was moving to Mexico and spoke with Y. about it. Y. never talked about any concerns with defendant and even stated she wanted to stay with Seferina and defendant. Y. appeared happy around defendant.

Defendant testified he had known C.A. and her family for about 10 years. C.A.'s family lived with defendant's family at one point. In 2019, he and his wife babysat C.A.'s children on occasion. Defendant and his wife watched C.A.'s children for six days in September and 15 days in May. While babysitting for 15 days in May, Seferina was not working and was home with the children. Defendant and Seferina were both working when they babysat C.A.'s children for six days in September, when C.A. and her husband went out of town to a different state.

When defendant and Seferina babysat in September, defendant and his older daughter took care of C.A.'s children while Seferina was at work. Defendant would be

9.

home when Y. was dropped off after school, which was between 5:30 and 7:00 p.m. Y.'s younger brothers did not go to school. So, when Y. would arrive at defendant's house after school, her younger brothers were there as well. Defendant stated his daughters were always at home when Y. came home. When Y. was dropped off after school, defendant would have his older daughter check on Y. and get her something for dinner. Defendant denied ever talking to Y., tickling her, or touching her. He testified Y. would stay in the living room with her brothers and watch television until Seferina arrived. Defendant would watch television with them.

Defendant's bedroom had a lock on the door. His bedroom was divided by a curtain. On one side of the curtain was two beds: one bed was where defendant and his wife slept, and the other smaller bed was where Y. slept. Y.'s brothers shared a bed in defendant's bedroom on the other side of the curtain. There was also a bunk bed on this side, but Y. did not want to sleep with her brothers because they would wake her up. There was a television on each side of the curtain. Defendant stated they had the same sleeping arrangements when Y. and her brothers stayed with defendant for the 15 days in May. During these two weeks, defendant stated he did not have any interaction with Y. because his wife was not working and took care of them all day until they went to sleep.

Defendant stated he never put Y. to bed. Defendant would pick up Seferina from work when she finished at 9:00 p.m. The last time defendant babysat C.A.'s children was before November 5, 2019.

Defendant denied touching or licking Y.'s private area, putting his fingers or face in her private area, and undressing in front of her. He also denied exposing his privates to Y. or showing any affection towards her. When asked why his wife said he tickled Y., defendant responded he did not know why she said that, but maintained he never tickled Y. Defendant also denied telling Y. not to say anything about anything that happened with him. Defendant stated he "[a]lmost never spoke to her" and they never did anything

10.

together. He denied ever going into his bedroom and closing the door and locking it with Y. inside.

Defendant admitted he walked around the house without a shirt on in front of C.A.'s children. He explained he never had a shirt on at home. But he denied Y. ever saw him without his pants on or with his pants down.

Defendant said he never got the impression that Y. was unhappy with him. The last time defendant saw Y. was when they had a yard sale in December.

Defendant testified he had a family member who was the victim of child sexual assault and he is aware of how it affects a family. Because he has a family member who was a victim of childhood sexual assault, defendant stated he is extra cautious around children. Defendant stated that was why he stayed away from little boys and little girls.

***Verdict and Sentence***

Defendant was charged with oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b)). Counts 1 and 2 alleged separate acts of sexual penetration, and counts 3 and 4 alleged separate acts of oral copulation. Each count was alleged as to the same victim—Y.

The jury found defendant guilty of count 1, sexual penetration of a child 10 years of age or younger, to wit, Y., "the first time" (§ 288.7, subd. (b)), and count 3, oral copulation of a child 10 years of age or younger, to wit, Y., "the first time" (§ 288.7, subd. (b)). The jury was deadlocked and unable to reach a verdict as to count 2, sexual penetration "the last time," and count 4, oral copulation "the last time," and the court declared a mistrial as to these counts. The court sentenced defendant to consecutive terms of 15 years to life for each count for an aggregate term of 30 years to life. Defendant was also ordered to register as a sex offender under section 290 and to submit to a blood test for AIDS under section 1202.1. The court granted the People's motion to dismiss counts 2 and 4.

11.

**DISCUSSION**

**I.      The CSAAS Evidence Was Properly Admitted**

Defendant contends the CSAAS evidence should not have been admitted at trial, arguing such evidence was irrelevant and prejudicial.  Defendant further contends this court should determine CSAAS evidence is unreliable as a matter of law because it does not meet the legal requirements for the admissibility of scientific evidence.  The People contend the trial court did not abuse its discretion when it admitted the expert's testimony regarding CSAAS.  We agree with the People and conclude the trial court did not abuse its discretion.

**A.      Relevant Factual and Procedural History**

In motions in limine, the People sought to introduce, and defendant sought to exclude, testimony from David Love regarding CSAAS.  Defendant contended CSAAS was unreliable and should be excluded because "it is not at this time a valid subject of scientific expertise."  Alternatively, he contended that Love's testimony, if admitted, should be limited to rehabilitating Y.

The People sought to admit the evidence "for the limited purpose of explaining the myths of sexually abused children and to show that victims' reactions as demonstrated by the evidence are not inconsistent with having been sexually abused." The People stated the purpose of the CSAAS testimony was to explain certain myths regarding the stages of CSAAS: secrecy, helplessness, entrapment or accommodation, delayed or unconvincing disclosure, and recanting or retraction.  And that CSAAS evidence is admissible to rehabilitate a witness's credibility when the defendant suggests the child's conduct after the incident is inconsistent with the child's testimony regarding the molestation.

At the pretrial hearing, the court stated it would allow Love's testimony but they needed to "hash out" the specifics.  "I think it's an area that will help jurors that are not generally familiar with … sexual[ly] abused children ….  And he can clear that up to a

point." The court ruled Love could not testify about the specifics of Y.'s case, the concept of "grooming" a sexual abuse victim, or a general profile of a predator or pedophile.

The trial court precluded specific statistics about how often children are telling the truth about sexual abuse but allowed testimony that "it is not uncommon for children to delay in reporting." The court disagreed with the defense and allowed evidence regarding core memory and peripheral memory, noting that "[p]lenty of witnesses who would be deemed experts were not neurologists talking about memory. We have identification experts who have testified over the years and other child sexual assault experts that are not neurologists. And I think that's—assuming they have some qualification to discuss it, I think memory is a fair subject for Mr. Love."

The People called David Love, the founder and executive director of Valley Community Counseling Services. He had been a licensed therapist since 1979. Love spoke about CSAAS, which explains how children often react to being sexually molested. He explained CSAAS is based on a study first published in the International Journal of Child Abuse and Neglect in 1983.

Love stated he was there to talk about five common behaviors exhibited by children who have been molested and he was not there to discuss whether the victim in this case was actually molested. Love explained he did not know anything about the facts of this case and had not read the police reports because he was there as a teacher or educator explaining common symptoms of abused children and how they react. Love stated he was not there to be diagnostic.

Love explained the five patterns of behaviors associated with sexually abused children are (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted and unconvincing disclosure, and (5) retraction. CSAAS is not used to diagnose or prove the abuse happened.

13.

Secrecy is one of the most common themes in child abuse. Often children are coerced, threatened, or manipulated into secrecy. There may be secrecy when the offender is an important person or family member and the child feels no one is going to believe them, or fear they will be in trouble. Often the secret does not come out until some event allows it to surface. As such, Love stated you should not disregard what the child is saying just because it comes out months or years later. Rather, "the secret doesn't demean the probability that it may truly have happened."

The second factor is helplessness; it addresses how the child is feeling. Love explained children are generally molested by someone they have a relationship with and are therefore molested in places that should be safe. This damages their ability to trust and believe in other people and their willingness to confide in other people. Children feel helpless until the information gets out and people rally resources around them.

The third factor is entrapment and accommodation; it addresses how children cope when they feel helpless, trapped, and stuck in a very difficult situation. Some children use drugs and alcohol as a means of accommodation while others fall into cutting, self-mutilating, suicidal or promiscuous behaviors. When there is a threat, you can fight, flee or freeze. Most children cannot fight and they may not be able to flee if it is occurring in their home, so they freeze or dissociate from the event. Freezing causes a person to lose their normal coping mechanisms and adopt a coping mechanism such as becoming "the Super Hero Kid," where the child resorts to being the best they can be, hoping that by doing better it will not happen to them again. Love explained, if a child says they were molested, you cannot look to the fact they are still doing well to eliminate the possibility they were really molested.

The fourth factor has three parts: delayed, conflicted, and/or unconvincing disclosure. Often, children do not reveal the abuse right away. Delay should not be used to evaluate whether the claim is true or not. Children who are traumatized have high levels of cortisol, a stress hormone that affects their memories. This results in a

consistency problem, especially given that they do not want to talk about this topic and will feel stressed and embarrassed. As such, children who are molested often do not consistently tell the same story because they will "miss[] stuff," or there will be "new stuff, different stuff, described differently stuff" they remember.

Last, Love explained sexually abused children will often retract part of their story because they become unwilling to talk about it or it is too embarrassing. They may not want to talk about the abuse on the witness stand in court and may indicate they cannot remember it.

Love reiterated these behaviors are not diagnostic and are not used to prove the abuse really happened. He said that "if they have these behaviors, secrecy, delayed reporting, difficulty with peripheral memory, please do not use that to argue, oh, my goodness, they are probably not telling the truth because they waited so long. Or they are not telling the truth because they can't remember some pieces." The presence of these behaviors should not be a reason to discredit the child. Love again confirmed he had never met the child in this case or read the related police reports.

## B. Standard of Review

"[T]he decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.'" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*); accord, *People v. Brooks* (2017) 3 Cal.5th 1, 43; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 170 (*Lapenias*); see Evid. Code, § 353, subd. (b).) A claim the trial court improperly admitted CSAAS testimony is therefore reviewed for abuse of discretion. (*Lapenias*, *supra*, at p. 170.)

If the reviewing court concludes the court abused its discretion in admitting evidence, the court must determine whether admission of such evidence resulted in a miscarriage of justice. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) In a criminal case, a miscarriage of justice can only be found when the reviewing court determines it is

15.

reasonably probable a result more favorable to the defendant would have been reached had the trial court excluded the erroneously admitted evidence. (See *People v. Lazarus* (2015) 238 Cal.App.4th 734, 787, fn. 53; see also *Watson*, *supra*, at p. 836.)

## C. Applicable Law

### 1. Expert Opinion Testimony

"No evidence is admissible except relevant evidence." (Evid. Code, § 350; see *Lapenias*, *supra*, 67 Cal.App.5th at p. 170.) "Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351; see *Lapenias*, at p. 170.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness …, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see *Lapenias*, at p. 171.) Opinion testimony by an expert witness is admissible if it is, inter alia, "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact …." (Evid. Code, § 801, subd. (a); see *McAlpin*, *supra*, 53 Cal.3d at p. 1299.)

### 2. Child Sexual Abuse Accommodation Syndrome

"The theory of child sexual abuse accommodation syndrome was first delineated by Roland Summit." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 389, fn. 3 (*Bowker*).) The syndrome describes five characteristic behaviors or stages commonly found in, or experienced by, children who have been sexually abused: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, and unconvincing disclosure; and (5) retraction. (*Id*. at p. 389; Note, *Expert Testimony: Seeking an Appropriate Admissibility Standard for Behavioral Science in Child Sexual Abuse Prosecutions* (1999) 48 Duke L.J. 933, 943–944.)

Although inadmissible to prove that a molestation occurred, CSAAS testimony has been held admissible "'to disabuse jurors of commonly held misconceptions about

16.

child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301 ["'great majority of courts approve such expert rebuttal testimony'"]; accord, *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 [CSAAS is admissible for "disabusing a jury of misconceptions it might hold about how a child reacts to a molestation"]; *Bowker*, *supra*, 203 Cal.App.3d at p. 391; *Lapenias*, *supra*, 67 Cal.App.5th at p. 171 [well established in California that CSAAS is relevant for evaluating the credibility of an alleged child victim of sexual abuse].) Where CSAAS evidence is admitted, the evidence must be tailored to target some particular myth or misconception suggested by the evidence and to avoid the danger that it might be considered by the jury as a predictor of molestation. (*Bowker*, *supra*, at pp. 393–394; *People v. Bledsoe* (1984) 36 Cal.3d 236, 247–248.)

### D.    Analysis

Defendant raises several claims regarding the admission of CSAAS evidence at trial. First, he claims the "CSAAS evidence should not have been admitted at all because such evidence is so irrelevant and prejudicial that it renders the proceedings fundamentally unfair in violation of [defendant's] rights to due process of law and to a fair trial." In support of this, defendant argues the CSAAS evidence was irrelevant as it did not apply to the facts of this case and because there are no longer misconceptions to correct. Defendant further contends the testimony in this case was particularly prejudicial because the expert testified in a manner that unfairly vouched for the victim's credibility. Second, defendant claims Love's statement that delayed reporting is almost the norm in child sex abuse cases was akin to improper use of statistical evidence. Third, defendant claims "CSAAS evidence is unreliable as a matter of law to prove that a molest has occurred" and, therefore, it should not have been admitted at his trial. Fourth, defendant claims the evidence was so prejudicial that it rendered the trial fundamentally unfair. The People point out California courts have affirmed CSAAS evidence is

admissible for the limited purposes of dispelling commonly held misconceptions lay jurors may have about how child victims typically react to sexual abuse and to rehabilitate a child witness's credibility. We conclude the trial court did not abuse its discretion in admitting the CSAAS evidence and reject each of defendant's contentions in turn.

### 1. The CSAAS Testimony Was Relevant to the Jury's Assessment of Y.'s Credibility

We first reject defendant's contention the CSAAS evidence was irrelevant because it did not apply to the facts of this case and because there are no longer misconceptions to correct. CSAAS evidence is relevant when it is offered at trial where the victim's credibility is called into question based on one of the five common myths or misconceptions about child victims of sexual abuse. (*Lapenias*, *supra*, 67 Cal.App.5th at pp. 171, 172 [delayed disclosure of abuse]; *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301; [delay in reporting inconsistent with testimony claiming molestation]; *People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745 [delayed reporting or recantation of prior allegations].) Specifically, the spectrum of CSAAS evidence covers secrecy, helplessness, entrapment, accommodation, and recantation. (*Lapenias*, at pp. 172–173.)

In *Lapenias*, the victim was sexually abused at nine or 10 years old, did not report the abuse for several years, mostly did not resist the abuse when it happened, and was inconsistent as to the number of times the abuse happened. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 172.) Under these circumstances, "the CSAAS evidence was relevant for the purposes of assessing [the victim's] credibility." (*Ibid.*) "That is, the CSAAS testimony may have informed some jurors that [the victim's] apparent accommodation, helplessness, secrecy, and delayed disclosures were typical reactions among children who have been sexually abused." (*Ibid.*) And the admission of the CSAAS testimony "was well within the bounds of reason and did not constitute an abuse of discretion." (*Ibid.*)

18.

Here, since Y.'s behavior was consistent with several patterns of CSAAS, admitting the expert's testimony on CSAAS was relevant to assessing Y.'s credibility. First, Y. kept the sexual abuse a secret and did not report it to anyone for about eight months. Thus, the expert's testimony that secrecy and delayed reporting are among five common patterns of behavior for a child abuse victim was relevant to the jury's assessment of Y.'s delayed disclosure. Next, Y.'s mother stated that when she spoke with Y. about her time at defendant's house, Y. said everything was going well, everything was good, Seferina was taking care of her well, and defendant loved her a lot. Defendant was a family friend. Y.'s family had lived with defendant for a while, and Y.'s mother relied on him and his wife for occasional babysitting. Accordingly, the CSAAS evidence regarding secrecy and helplessness was also relevant to inform the jurors that when an abuser is someone the child knows, it is common for a child victim to feel helpless and keep the abuse a secret. CSAAS evidence regarding helplessness, entrapment, and accommodation was also relevant to explain why Y. did not resist or tell someone right away and why Y. may have said she wanted to stay with Seferina and defendant if her mother went to Mexico. Additionally, C.A. did not notice any changes in Y.'s behavior after she stayed at defendant's house, and Y. continued doing well in school. So, Love's explanation of coping mechanisms that included becoming the "Super Hero Kid" and working hard was relevant for the jury to assess the evidence that Y. remained a good student at school and her grades did not go down. Additionally, Y.'s description of the abuse was inconsistent. Y. stated that defendant put his finger inside her private more than 10 times but later estimated six times. In her forensic interview, she estimated this occurred less than five times. Y. stated defendant licked her private one time and then later said he did it five times. Because of these inconsistencies, CSAAS evidence regarding dissociation in children who are abused and the testimony that they often will not provide consistent statements or precisely recall the number of

19.

times they were abused was relevant to aid the jury in considering why Y.'s testimony may have been inconsistent.

Further, the trial court followed all proper procedures in limiting the scope of the expert witness's testimony. The expert was not allowed to vouch for the truthfulness of Y.'s allegations against defendant or to prove Y. was telling the truth. (See *McAlpin*, *supra*, 53 Cal.3d at p. 1300; *Lapenias*, *supra*, 67 Cal.App.5th at p. 180; *People v. Munch* (2020) 52 Cal.App.5th 464, 468 ["'The expert is not allowed to give an opinion on whether a witness is telling the truth'"].) The court ruled Love could not testify about the specifics of Y.'s case, the concept of "grooming" a sexual abuse victim, or a general profile of a predator or pedophile. Love did not interview Y. nor did he review the police reports or facts of the case. During his testimony, Love explained his role was not diagnostic, nor was he there to use the behaviors to prove what happened. Therefore, we conclude the trial court did not abuse its discretion in admitting CSAAS evidence as relevant evidence.

Defendant further contends Love's testimony "lack[ed] probative value" because it was generic and "CSAAS … is only meaningful when directly connected to a person—the defendant." However, as discussed *ante*, our Supreme Court has affirmed the probative value of such evidence. (See *McAlpin supra*, 53 Cal.3d at pp. 1300–1301.) And CSAAS evidence must be limited to target some particular myth or misconception suggested by the evidence and to avoid the danger that it might be considered by the jury as a predictor of molestation. (*Ibid.*; *Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394; see *People v. Bledsoe*, *supra*, 36 Cal.3d at pp. 247–251 [discussing limited use of rape trauma syndrome testimony to disabuse jury of widely held misconceptions about rape and rape victims].) The expert should not be applying CSAAS evidence to specific facts to avoid opining whether the victim's molestation claim is true. (See *Bowker*, *supra*, at p. 393.) Here, Love explained the presence of these common behaviors should not be used as a reason to discredit the child. Love confirmed he never met Y. nor had he read any

police reports on the case. And again, he explained the CSAAS behaviors are not diagnostic and are not used to prove whether it happened.

We also disagree with defendant's contention CSAAS is nothing more than common sense and that an expert is not necessary or relevant because there are no longer myths about delayed reporting from sexual abuse and no misperception to correct. The California Supreme Court in *McAlpin* court noted, "Most jurors, fortunately, have been spared the experience of being the parent of a sexually molested child." (*McAlpin*, *supra*, 53 Cal.3d at p. 1302.) Lacking such experience, and being left with only their intuition and relevant evidence to guide them, jurors might conclude the victim would report the incident right away, or would not tell their parent that they were having a good time if they were being abused, or that the victim would be able to remember details of the incident if it occurred. Because the expert could provide a basis for the jury to not follow these kinds of misconception, the evidence proffered by the prosecution was admissible under Evidence Code sections 210 and 801. (See *McAlpin*, at p. 1302.)

*McAlpin* is binding here. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; accord, *People v. Munch*, *supra*, 52 Cal.App.5th at p. 468 [rejecting argument public no longer holds presumed misconceptions CSAAS testimony purports to address, so such testimony is irrelevant, noting *McAlpin* "is binding on all lower courts in this state"].) "That other jurisdictions may disagree with it does not change its impact on California cases." (*Munch*, *supra*, at p. 468.)

### 2. The Expert Witness's Statements Were Not Akin to Statistical Testimony and Did Not Amount to Improper Vouching

Defendant contends Love's statement that "'delay is almost the norm and it ranges in big chunks whether it's a year or two or three years, or more'" was "tantamount to testifying that it would be statistically rare for a child to not delay reporting sexual abuse." Defendant relies on *People v. Wilson* (2019) 33 Cal.App.5th 559 and *People v. Julian* (2019) 34 Cal.App.5th 878 to argue this statement improperly vouched for Y.'s

21.

credibility. Defendant argues delay was a key issue in the defense challenging the credibility of the victim, and that Love's testimony "invaded the jury's role." Defendant also contends Love's testimony went beyond acceptable bounds when he testified "most" victims of sexual abuse delay reporting and that CSAAS is an explanation of how children "often" react to being sexually molested, and includes descriptions of the "most typical reactions or behaviors of molested children." He argues Love stepped into the realm of the jury when he testified it would be "unreasonable" to expect a child under the age of 10 to tell the exact same story to different people, so much so that the expert testified he would be "shocked" if a child were to do so. Defendant contends this was tantamount to testifying that children who do not repeat the same set of facts each time they report abuse are always telling the truth. We disagree with defendant's contentions.

In *Julian*, the CSAAS expert testified children falsely report sexual abuse "'*as low as one percent of cases* to a high of maybe 6, 7, 8 percent of cases.'" (*People v. Julian*, *supra*, 34 Cal.App.5th at p. 885.) The expert also testified false reports of sexual abuse by children are "'*very infrequent, or rare*,'" and "'don't happen very often.'" (*Id*. at pp. 883, 885.) The appellate court held these statistics were inadmissible as CSAAS evidence because they improperly invaded the jury's province of determining witness credibility by "invit[ing] jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide [on] the evidence properly introduced in the case." (*Id*. at p. 886.)

Similarly, in *Wilson*, the CSAAS expert testified about statistical studies showing that false allegations occur in only about 1 to 6 percent of cases. (*People v. Wilson*, *supra*, 33 Cal.App.5th at p. 568.) The expert asserted "'it's better to say that false allegations do happen, because they do happen, but they happen very infrequently and rarely.'" (*Ibid*.) This testimony was improper because statistical probabilities "tell[] the jury nothing about whether *this particular allegation is false*." (*Id*. at p. 571.) Indeed, the "jury must evaluate [the victims'] testimony, together with all the other evidence, to

22.

decide [the truth of the allegations], and it should do so without statistical evidence placing a thumb on the scale for guilt." (*Ibid*.; accord, *Lapenias*, *supra*, 67 Cal.App.5th at pp. 178–180 [expert testimony that it was "rare" for children to make false allegation was harmless error].)

Both *Wilson* and *Julian* are factually distinguishable from our case. Love never testified regarding the frequency of false allegations made by child victims of sexual abuse. To the contrary, the record demonstrates the trial court limited Love's testimony and precluded specific statistics about how often children are telling the truth about the sexual abuse but allowed testimony that "it is not uncommon for children to delay in reporting." (Cf. *Lapenias*, *supra*, 67 Cal.App.5th at p. 179 [error to admit expert testimony that it was "'rare' for children to make false allegations of sexual abuse"]; *People v. Wilson*, *supra*, 33 Cal.App.5th at pp. 568, 570 [expert testimony about studies finding false allegations in 1 to 6 percent of cases had the impermissible "effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth"]; *People v. Julian*, *supra*, 34 Cal.App.5th at pp. 883–884, 886 [false allegation statistics were not admissible because they "invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide [on] the evidence properly introduced in the case"].)

Love's testimony that delay in reporting is common is not the equivalent to a statistical probability the child is telling the truth. We disagree with defendant's assertion "Love's testimony had the effect of telling the jury that alleged child victims should be believed simply because they came forward." As discussed, Love explained CSAAS is not a diagnostic tool and does not prove a child was molested. Love testified behaviors consistent with CSAAS do not eliminate "the possibility they were molested" nor do they prove a child was molested. Love explained that evidence a child did not immediately report abuse would not actually prove abuse occurred. Love's testimony stating "do not use that to argue … they are probably not telling the truth because they waited so long" is

23.

not stating delay makes it any more or less likely they are telling the truth or lying. Rather, Love was using CSAAS to properly dispel any myths or misconceptions regarding delayed reporting. (See *McAlpin*, *supra*, 53 Cal.3d at p. 1300; *People v. Housley* (1992) 6 Cal.App.4th 947, 955; *Bowker*, *supra*, 203 Cal.App.3d at p. 394.)

Defendant also complains the CSAAS evidence had the effect of improperly vouching for Y.'s credibility and it preempted arguments to be made by the defense. It is true an expert may not cross over into affirmatively vouching for the truthfulness of a complainant's allegations against the defendant. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 180 [identifying the problem of the expert "'vouching for the veracity of the' alleged victims"]; *People v. Munch*, *supra*, 52 Cal.App.5th at p. 468 ["'The expert is not allowed to give an opinion on whether a witness is telling the truth'"].) However, Love never vouched for Y.'s credibility. To the contrary, Love was clear CSAAS behaviors are not diagnostic and are not used to prove the allegations really happened. Love did not give any opinion regarding the facts of this case because he had no knowledge of the facts of the case. He never met Y., nor had he read through any police reports. He simply stated the presence of certain behaviors, for example, delay in reporting the abuse, should not be used as a reason to consider a child is probably not telling the truth. Accordingly, we cannot conclude his testimony exceeded the permissible grounds for which it was offered.

### 3. *The Nature of the CSAAS Did Not Implicate* **Kelly/Frye**

Defendant contends CSAAS evidence does not meet the accepted legal standard in California for admission of a new scientific technique based on the California Supreme Court decision in *People v. Kelly* (1976) 17 Cal.3d 24. The *Kelly*/*Frye*[1] rule is a prerequisite for the admission of expert testimony regarding new scientific methodology, which requires a showing the method is generally accepted in the relevant scientific

---

[1]*Frye v. U.S.* (D.C.Cir. 1923) 293 Fed. 1013.

community. (*People v. Leahy* (1994) 8 Cal.4th 587, 604; *Lapenias*, *supra*, 67 Cal.App.5th at p. 173.) *Kelly/Frye* applies only to expert testimony "based, in whole or part, on a technique, process, or theory which is *new* to science, and even more so, the law." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156.)

In *People v. Bledsoe*, *supra*, 36 Cal.3d 236, the California Supreme Court applied *Kelly/Frye* to exclude expert psychological testimony based on the "rape-trauma syndrome" to prove that a rape had occurred. (*Bledsoe*, at p. 251; see *Bowker*, *supra*, 203 Cal.App.3d at p. 391.) The court held the "rape-trauma syndrome" did not meet the *Kelly/Frye* requirement because it was "not relied on in [the scientific] community for the purpose for which the prosecution sought to use it …." (*Bledsoe*, *supra*, at p. 251; see *Bowker*, *supra*, at p. 391.) "Expert testimony that the complaining witness was suffering from rape trauma syndrome was inadmissible to show a rape had actually occurred because the syndrome was developed as a 'therapeutic tool' and not to determine the '"truth" or "accuracy" of a particular past event.' [Citation.]" (*Bowker*, at p. 391.)

The court in *Bledsoe* suggested that even though the rape trauma syndrome failed the *Kelly/Frye* test, evidence related to the syndrome could be admissible to "disabus[e] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*People v. Bledsoe*, *supra*, 36 Cal.3d at pp. 247–248.) "Where the alleged [abuser] has suggested that conduct of the victim is inconsistent with having been raped, rape trauma syndrome evidence has been 'introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault.'" (*Bowker*, *supra*, 203 Cal.App.3d at p. 391; see *Bledsoe*, *supra*, at p. 247.)

Relying on *Bledsoe*, numerous appellate courts have held *Kelly/Frye* similarly precludes an expert from testifying based on CSAAS that a particular victim's report of alleged abuse is credible because the victim manifests certain defined characteristics generally exhibited by abused children. (See *In re Sara M.* (1987) 194 Cal.App.3d 585,

593; *Seering v. Department of Social Services* (1987) 194 Cal.App.3d 298, 310–311, 313; *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1099; *People v. Willoughby* (1985) 164 Cal.App.3d 1054, 1069.) As long as CSAAS evidence is not admitted for the purpose of being a predictor of child abuse or a diagnostic tool of abuse but offered in rebuttal to explain the unusual behavior of the complainant, then it does not involve the *Kelly/Frye* test. (*Bowker*, *supra*, 203 Cal.App.3d at p. 392.) "The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Id.* at p. 394.)

Here, no evidence was presented to support the notion CSAAS may be properly and accurately used to determine when a child has been abused. (See *Seering v. Department of Social Services*, *supra*, 194 Cal.App.3d at p. 313; *Bowker*, *supra*, 203 Cal.App.3d at pp. 391–392.) Rather, Love specifically testified CSAAS was not diagnostic and could not be used to prove whether a child was molested. Therefore, the CSAAS evidence was not subject to *Kelly/Frye,* and we find no error.

### 4. *Defendant's Undue Prejudice and Due Process Arguments Also Fail*

Defendant contends the CSAAS evidence was so unduly prejudicial that it rendered the trial fundamentally unfair. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Evidence is not prejudicial merely because it may be harmful to a criminal defendant's case. (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.) Evidence only creates undue prejudice if the evidence tends to evoke an emotional bias by the jurors against the defendant, and the evidence has little effect on the issues relevant in the case. (*Ibid.*; *Lapenias*, *supra*, 67 Cal.App.5th at p. 174.) As discussed, "CSAAS evidence is

relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*Lapenias*, *supra*, at p. 171.)

Defendant erroneously claims Love told the jury "that evidence of the witness lacking credibility was … proof the witness was credible." However, as previously discussed, Love never testified CSAAS was proof of credibility but, rather, certain behaviors should not be used to discredit the child.

Additionally, defendant's argument there is a likelihood the jury misused the CSAAS evidence as a diagnostic tool to determine Y. had been molested is without merit. As discussed, Love explained CSAAS evidence was not a diagnostic tool. Further, the trial court instructed the jury using CALCRIM No. 1193, which told the jury CSAAS is not evidence defendant committed any of the crimes charged against him, and CSAAS may only be used to consider whether the victim's conduct was not inconsistent with the conduct of someone who was molested. A limiting instruction that CSAAS evidence is not intended and should not be used to determine whether the victim's molestation claim is true helps reduce the risk a jury might misuse the CSAAS evidence. (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.) We presume the jury followed this instruction. (See *People v. Avila* (2006) 38 Cal.4th 491, 574; see also *People v. Hendrix* (2013) 214 Cal.App.4th 216, 247 ["A limiting instruction can ameliorate [Evidence Code] section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose"].)

Therefore, we conclude there was no undue prejudice resulting from the admission of Love's testimony. For these reasons, we also cannot conclude defendant has satisfied the high constitutional standard to show the admission of the CSAAS evidence deprived him of a fair trial and was so prejudicial as to render the trial fundamentally unfair. (*People v. Hall* (1986) 41 Cal.3d 826, 834–835.) Further, reviewing courts have routinely held the admission of CSAAS evidence does not violate due process. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174 ["Generally, a court's compliance with the

27.

rules of evidence does not violate a defendant's right to due process"]; see, e.g., *People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744–1745 [trial court's admission of CSAAS evidence did not violate due process].)

## II. The Trial Court Properly Instructed the Jury Using CALCRIM No. 1193

Defendant claims, as given here, CALCRIM No. 1193 erroneously told the jury it could use the CSAAS evidence to evaluate the "believability" of the victim's testimony, which violated defendant's right to due process of law and the right to a fair trial.

### A. Relevant Procedural History

The trial court instructed the jury with CALCRIM No. 1193, as follows:

> "You have heard testimony from David Love regarding child sexual abuse accommodation syndrome. [¶] Mr. Love's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Y.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

The court also issued the pattern instruction for expert witnesses (CALCRIM No. 332) and for cautioning the jury that some evidence was admitted for a limited purpose (CALCRIM No. 303).

### B. Applicable Law and Standard of Review

Instructional error is subject to de novo independent review. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Posey* (2004) 32 Cal.4th 193, 218.) This type of error is reviewable on appeal even in the absence of an objection in the lower court. (*People v. Dunkle* (2005) 36 Cal.4th 861, 929, citing § 1259, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Hernandez* (1988) 47 Cal.3d 315, 353.) Under section 1469, a reviewing court "may … review any instruction given, refused or modified, even though no objection was made thereto in the trial court if the substantial rights of the defendant were affected thereby."

## C.  Analysis

As noted, defendant claims CALCRIM No. 1193 erroneously told the jury it could use the CSAAS evidence to evaluate the "believability" of the victim's testimony, thereby broadening the limited use of CSAAS evidence and violating his right to due process of law and the right to a fair trial.  Defendant compares CALCRIM No. 1193 with its predecessor, CALJIC 10.64, which he claims properly advised the jury CSAAS evidence was restricted to determining whether the alleged victim's reactions were not inconsistent with having been molested and did not instruct the jury to use CSAAS testimony to assess the victim's credibility.  The People first note defendant did not object to CALCRIM No. 1193 at trial.  They also argue CALCRIM No. 1193 "'accurately instructs the jury on the law:  the proper use—and the proper limitations on the use—of CSAAS evidence.'"

First, defendant's failure to object to the use of CALCRIM No. 1193 does not preclude a claim the instruction incorrectly stated the law.  (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)  However, appellate courts have consistently rejected the notion that CALCRIM No. 1193 misstates the law regarding CSAAS or improperly lowers the prosecution's burden of proof.  In *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504, the court explained,

> "The purpose of CSAAS is to understand a child's reactions when they have been abused.  [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused.  The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested.  The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.  Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested.  There is no conflict in the instruction." (*Ibid.*; accord, *People v. Munch*, *supra*, 52 Cal.App.5th at p. 474 [rejecting contention CALCRIM No. 1193's statement that jurors may use CSAAS evidence "'in evaluating the

29.

believability'" of the child's testimony means jurors will improperly use such evidence to find defendant guilty]; see *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175–176 [concluding CALCRIM No. 1193 "accurately instructs the jury on the law:  the proper use—and the proper limitations on the use—of CSAAS evidence"].)

We also agree the trial court did not err by instructing the jury with CALCRIM No. 1193.  When looking at delay in reporting, the instruction is read to mean CSAAS can tend to show Y.'s delay in reporting abuse was not inconsistent with abuse having occurred, which is how the CSAAS evidence may be used to evaluate Y.'s credibility.  In other words, the jury may properly consider CSAAS as mitigating the harm to Y.'s credibility posed by the delay in her reporting of the abuse.

Further, CALCRIM No. 1193 does not instruct the jury the CSAAS evidence may be used to corroborate the claims of the abuse.  To the contrary, the instruction makes clear CSAAS testimony "is not evidence that the defendant committed any of the crimes charged against him."  The court also issued the pattern instruction for expert witnesses and for cautioning the jury that some evidence was admitted for a limited purpose.

Accordingly, we summarily reject defendant's contention the court erred in instructing the jury with CALCRIM No. 1193.

### III.  Defendant's Sentence Does Not Violate the Prohibition Against Cruel and Unusual Punishment

Defendant contends the punishment imposed for his "single period of aberrant behavior was grossly excessive and constitutes cruel and unusual punishment under the state and federal constitutions."  The People respond his claim is forfeited for failure to object on this ground below.  They also contend this claim fails on the merits because his sentence comports with both the state and federal Constitutions.  We conclude defendant's sentence does not constitute cruel and unusual punishment.

#### A.  Relevant Factual Background

At sentencing, defense counsel asked the court to impose concurrent, rather than consecutive sentences.  The court declined to do so, stating:  "There is a request for

30.

concurrent time regarding Counts 1 and 3.  The Court [is] to decide and exercise discretion if appropriate.  In this matter the Court is swayed by the fact that the Defendant took advantage of a position of trust.  Furthermore, the Court is convinced that these acts occurred on more than one occasion during the period the victim was placed in the Defendant's care.  For that reason a request for concurrent time is denied."  The court imposed consecutive sentences of 15 years to life for each of defendant's convictions in counts 1 and 3 for a total of 30 years to life.

## B.    Applicable Law and Standard of Review

The Legislature mandates a term of 15 years to life in state prison for sexual penetration when the victim is 10 years old or younger.  (§ 288.7, subd. (b).)  The same term is mandatory for oral copulation when the victim is 10 years old or younger.  (*Ibid*.)

The Eighth Amendment to the United States Constitution applies to the states and prohibits the infliction of "cruel and unusual" punishment.  (U.S. Const., 8th Amend.; see *People v. Caballero* (2012) 55 Cal.4th 262, 265, fn. 1.)  "Article I, section 17 of the California Constitution prohibits infliction of '[c]ruel *or* unusual' punishment.  (Italics added.) The distinction in wording is 'purposeful and substantive rather than merely semantic. [Citations.]'  (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085.)  As a result, we construe the state constitutional provision 'separately from its counterpart in the federal Constitution. [Citation.]'  (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136.)"  (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82; accord, *People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).)

Challenges on the grounds of cruel and unusual punishment raise questions of law and are subject to independent review by the appellate court. (*People v. Anderson* (1972) 6 Cal.3d 628, 641; *People v. Mora* (1995) 39 Cal.App.4th 607, 615.)  The underlying disputed facts are viewed in the light most favorable to the trial court. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.)

31.

### C.       Analysis

Defendant contends his indeterminate sentence of 30 years to life for two counts under section 288.7, subdivision (b) constitutes cruel and/or unusual punishment. We disagree.

First, a claim a sentence imposes cruel and/or unusual punishment is fact-specific and forfeited if not raised in the trial court. (*Baker*, *supra*, 20 Cal.App.5th at p. 720; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.) At sentencing, defendant did not claim his sentence violated either the state or federal Constitution as cruel and/or unusual punishment. Therefore, defendant has forfeited this issue. (See *Baker*, at p. 720.) However, we have the discretion on appeal to address the merits. (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1145, fn. 12; see *People v. Reyes* (2016) 246 Cal.App.4th 62, 86.) Therefore, we may determine, on de novo review, whether defendant's sentence was cruel or unusual. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1474; *Baker*, *supra* at p. 721.)

### *1.       California Constitution*

A punishment is cruel or unusual in violation of the California Constitution "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).) Because it is the Legislature's function to define crimes and prescribe punishments, the judiciary should not interfere "unless a statute prescribes a penalty 'out of all proportion to the offense.'" (*Id*. at p. 424.) In reviewing an indeterminate sentence, "it is the maximum term prescribed by the statute—not a lesser period thereafter fixed as an 'incentive to well-doing'—which must survive constitutional scrutiny." (*Id*. at pp. 416–417.) Thus, in evaluating defendant's sentence of 15 years to life, we must consider whether a life sentence withstands constitutional scrutiny, notwithstanding his parole eligibility. (See *Baker*, *supra*, 20 Cal.App.5th at p. 723.)

*Lynch* describes three "techniques" to determine whether a sentence is so disproportionate to the crime as to constitute cruel or unusual punishment. (*Lynch*, *supra*, 8 Cal.3d at p. 425.) First, we consider "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*Ibid.*) Second, we compare the sentence to "punishments prescribed in the *same jurisdiction for different offenses* which, by the same test, must be deemed more serious." (*Id*. at p. 426.) Third, we compare the sentence "with the punishments prescribed for the *same offense in other jurisdictions* having an identical or similar constitutional provision." (*Id*. at p. 427.) The weight afforded to each prong may vary by case. (See *People v. Dillon* (1983) 34 Cal.3d 441, 479 [relying heavily on first prong].) "Disproportionality need not be established in all three areas." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.)

### a.    Nature of the Offense

Factors to consider in evaluating the nature of the offense include the seriousness of the offense and the presence of violence, victims, or aggravating circumstances. (*Lynch*, *supra*, 8 Cal.3d at pp. 425–426; *In re Rodriguez* (1975) 14 Cal.3d 639, 654.) In assessing the nature of the offense and the offender, courts consider the offense not only in the abstract, but also "the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of [the defendant's] acts." (*People v. Dillon*, *supra*, 34 Cal.3d at p. 479.) Courts also "evaluate whether the punishment fits *the criminal*." (*Baker*, *supra*, 20 Cal.App.5th at p. 724.) In doing so, the court focuses "on the particular person before the court, [asking] whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Dillon*, at p. 479.)

33.

Defendant was convicted of one count of sexual penetration and one count of oral copulation of a child 10 years of age or younger in violation of section 288.7, subdivision (b).

> "Section 288.7 was enacted as part of the Sex Offender Punishment, Control, and Containment Act of 2006 (the Act). [Citation.] … The primary purpose of the Act was to prevent 'future victimization' of the community by sex offenders. [Citation.] Among the provisions of the Act was the creation of several new criminal offenses involving child victims," including a "new offense imposing an indeterminate life sentence for sexual intercourse, sodomy, oral copulation or sexual penetration of 'a child who is 10 years of age or younger' in section 288.7." (*People v. Cornett* (2012) 53 Cal.4th 1261, 1267; accord, *Baker, supra*, 20 Cal.App.5th at p. 722.)

As stated by the Supreme Court in *People v. Olsen* (1984) 36 Cal.3d 638, 646, "There exists a strong public policy to protect children of tender years." Along a spectrum ranging from murder, mayhem and torture on one end to petty theft on the other, "lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable." (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806.) "[S]exual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244.)

Defendant argues he is almost 50 years old with no prior criminal record and his violations arose from contact with one child. Defendant argues there were no threats of violence and no force involved and that he did not "hurt" Y. However, the record demonstrates several aggravating circumstances. Although these incidents involved one child, they occurred on more than one occasion. Y.'s young age of eight years at the time of the incidents made her particularly vulnerable. Defendant was an adult who chose to sexually assault an eight-year-old child. Defendant abused his position of trust over Y. as her adult caretaker to commit the offenses. (See Cal. Rules of Court, rule 4.421(a)(3) & (11); *People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413.) Defendant showed

calculated, premeditated efforts by waiting to sexually assault Y. until after his wife left for work and the other children were put to sleep. Y. was made to sleep in the bed next to defendant's bed, and a curtain separated Y.'s bed from her brothers' bed. Defendant was in complete control of the situation and instigated multiple sex offenses against Y. (See, e.g., *Baker*, *supra*, 20 Cal.App.5th at p. 725; *People v. Reyes*, *supra*, 246 Cal.App.4th at p. 88.)

Further, one does not have to be physically harmed to sustain psychological damage. (*People v. Reyes*, *supra*, 246 Cal.App.4th at p. 85.) Courts have recognized lewd conduct "may have lifelong consequences to the well-being of the child." (*People v. Christensen*, *supra*, 229 Cal.App.4th at p. 806; see *J.C. Penny Casualty Ins. Co. v. M.K.* (1991) 52 Cal.3d 1009, 1026 [not a one-time harm]; see also *Kennedy v. Louisiana* (2008) 554 U.S. 407, 467–469 (dis. opn. of Alito, J.) [reviewing studies detailing long-term psychological impacts of child sexual abuse].) The evidence shows defendant on separate occasions placed his fingers inside Y.'s vagina and licked her vagina, even though Y. told him to stop. Y. said she felt scared and wanted to scream for help. Y. said defendant touched her hard to the point it hurt. And Y. did not tell her mother because she was scared defendant would do something to her. As such, there was some level of both physical and psychological harm. (See *Baker*, *supra*, 20 Cal.App.5th at p. 725.) Furthermore, defendant likely understood the long-term harm sexual abuse causes since one of his family members was a victim of sexual abuse. (*Stogner v. California* (2003) 539 U.S. 607, 651 (dis. opn. of Kennedy, J.) ["When a child molester commits his offense, he is well aware the harm will plague the victim for a lifetime"].)

We acknowledge defendant did not have a criminal record, which is a favorable factor. However, it does not outweigh the several aggravating factors discussed above. (See *Baker*, *supra*, 20 Cal.App.5th at p. 725; *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 845 [lack of prior record not determinative when "seriousness of the

crime and the circumstances surrounding its commission substantially outweigh these factors"], disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

The facts here are similar to those in *Baker* and *People v. Gomez* (2018) 30 Cal.App.5th 493. In *Baker*, the defendant was the 50-year-old uncle of his six-year-old victim. While visiting the victim's family, the defendant brought the victim into bed with him, rubbed her stomach, pulled down her underwear, touched her vagina, orally copulated her, and kissed her mouth. (*Baker*, *supra*, 20 Cal.App.5th at pp. 716–717, 725.) The Court of Appeal held the indeterminate 15-year-to-life sentence imposed on the defendant for oral copulation of a victim under the age of 10 was not cruel or unusual. (*Id*. at pp. 722–732.) The defendant's lack of prior history of sex crimes did not outweigh the fact he perpetrated three unprovoked sexual acts against the victim, did not stop the molestation immediately, ignored the victim's protestations, and was a mature adult in "complete control of the situation." (*Id.* at p. 725.)

In *Gomez*, the defendant was sentenced to 15 years to life after being convicted of sexual penetration of a child under 10 years old. (*People v. Gomez*, *supra*, 30 Cal.App.5th at p. 499.) The appellate court rejected his claim the sentence was cruel or unusual punishment. (*Id*. at pp. 499–502.) Although the defendant had no criminal record, he had abused a position of trust to molest a "child of very tender years," had taken advantage of his physical dominance, and instilled fear by threatening to harm the victim and her family. (*Id*. at p. 501.)

Similarly here, Y. was under the age of 10 and defendant was an adult caretaker who took advantage of a position of trust. Defendant ignored Y.'s protests and sexually assaulted her on more than one occasion. Therefore, defendant's two consecutive sentences of 15 years to life for orally copulating Y. and sexually penetrating her are not disproportional to the nature of the offense and offender.

### b. Comparison to punishment for other crimes in California

The second prong in *Lynch* requires us to compare defendant's sentence to "punishments prescribed in the *same jurisdiction for different offenses* which, by the same test, must be deemed more serious." (*Lynch*, *supra*, 8 Cal.3d at p. 426.) In doing so, we must remember the Legislature bears the responsibility for fixing the penalty of crimes. (*Id*. at pp. 423–424.) "Punishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime. Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual." (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 530–531; see *Baker*, *supra*, 20 Cal.App.5th at p. 727.)

"The power to define crimes and prescribe punishments is a legislative function." (*People v. Young* (1992) 11 Cal.App.4th 1299, 1308.) This court's "role is a limited one, and we proceed with great deference to the Legislature." (*Baker*, *supra*, 20 Cal.App.5th at p. 729.) "'Furthermore, great deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses.'" (*Ibid*., citing *In re Wells* (1975) 46 Cal.App.3d 592, 599.)

Courts have held a sentence of 15 years to life for a single act of oral copulation of a child under 10 years old or a single act of sexual penetration of a child under age 10 years old is not disproportional to punishment for other crimes in California. (See *Baker*, *supra*, 20 Cal.App.5th at pp. 727–730 [oral copulation]; *People v. Gomez*, *supra*, 30 Cal.App.5th at p. 502 [sexual penetration].)

Defendant points out the following convictions also carry punishment of 15 years to life: second degree murder (§ 190, subd. (a)), attempted premeditated murder of a police officer (§ 664, subd. (f)), sex trafficking of a minor by force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of injury (§ 236.1, subd. (c)(2)), and lewd or lascivious acts with a child under age 14 (§ 288) or continuous sexual abuse of a child under age 14 (§ 288.5), with two prior convictions of serious sex crimes (§ 667.61, subd.

(c)). Defendant contends his sentence is disproportionate to his crimes because his offenses did not involve violence, threat of force, or intentional infliction of serious bodily injury.

However, none of the offenses defendant cites involve sex crimes against a child under 10 years old. And defendant was convicted of two separate sex crimes against an eight-year-old child. "It is well within the prerogative of the Legislature to determine that sex offenses against young children are deserving of longer sentences than sex offenses against adults or nonsex offenses." (*People v. Gomez*, *supra*, 30 Cal.App.5th at p. 502.) Even compared to the sex crimes listed by defendant, such as rape of a child under 14 in concert with another person (§ 264.1, subd. (b)(1)), he fails to offer a crime comparable to the facts of this case involving a victim under the age of 10 years old, nor does defendant acknowledge he was convicted of two separate instances of the crime.

Therefore, defendant has not shown that his punishment is disproportional to punishment for other crimes in California.

### c. Comparison of California's Punishment to the Same Crime in Other States

The third *Lynch* technique is a comparison of defendant's sentence "with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision." (*Lynch*, *supra*, 8 Cal.3d at p. 427.) "Here the assumption is that the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness." (*Ibid*.)

Defendant notes the out-of-state punishment for a single violation of section 288.7 in Oregon has a maximum sentence of 20 years (Or. Rev. Stat., §§ 161.605, 163.305, subd. (1), 163.405 ["deviate sexual intercourse," including oral copulation, with a child

under 12]) and in New York the crime of oral sexual conduct with a child under age 11 is punished by five to 25 years in prison. (N.Y. Pen. Law, §§ 70.02, subds. (1)(a) & (3)(a), 130.50, subd. (3).). *Baker* and *Gomez* already considered laws in these same states and concluded they did not make the 15-year-to-life term for section 288.7 disproportional. (See *Baker*, *supra*, 20 Cal.App.5th at p. 730; *People v. Gomez*, *supra*, 30 Cal.App.5th at p. 502.) We agree with their analysis. Even if "California's punishment scheme is among the most extreme," this "does not compel the conclusion that it is unconstitutionally cruel or unusual." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.) We do not see "'a significant disproportion between a challenged penalty and that imposed for the same crime by our sister states.'" (*Baker*, *supra*, at p. 730, quoting *People v. Wingo* (1975) 14 Cal.3d 169, 179 ["when there appears a significant disproportion between a challenged penalty and that imposed for the same crime by our sister states, the penalty should be deemed suspect"]

Considering the three *Lynch* factors, we conclude defendant's sentence is not so disproportionate to his criminality as to shock the conscience or offend fundamental notions of human dignity. (See *People v. Dillon*, *supra*, 34 Cal.3d at pp. 477–478; *Lynch*, *supra*, 8 Cal.3d at p. 424.)

### 2. *Federal Constitution*

The Eighth Amendment to the United States Constitution applies to the states and prohibits the infliction of cruel and unusual punishment. (U.S. Const., 8th Amend.; *People v. Caballero*, *supra*, 55 Cal.4th at p. 265, fn. 1.) The Eighth Amendment "contains a 'narrow disproportionality principle'" prohibiting only extreme sentences that are grossly disproportionate to the crime. (*Graham v. Florida* (2010) 560 U.S. 48, 59–60.) The analysis begins "by comparing the gravity of the offense and the severity of the sentence." (*Id.* at p. 60.) "This analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to his victim or to society by

his conduct, and any prior criminal history." (*Id.* at p. 88 (conc. opn. of Roberts, C. J.).) Only in the rare case in which this threshold comparison leads to an "'inference of gross disproportionality'" do courts proceed to "compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." (*Id.* at p. 60.)

As discussed above under the first prong of *Lynch*, we have already "compar[ed] the gravity of the offense and the severity of the sentence," including defendant's mental state or motive in committing the crime, the actual harm caused to Y. by his conduct, and any prior criminal history. (See *Graham v. Florida*, *supra*, 560 U.S. at pp. 60, 88 (conc. opn. of Roberts, C. J.).) We concluded this threshold test does not lead to an inference of gross disproportionality, and further, his sentence is not out of proportion with sentences for similar crimes in other states. Therefore, defendant's sentence does not constitute cruel and unusual punishment under the Eighth Amendment.

## IV. AIDS Testing Pursuant to Section 1202.1 Must Be Stricken

At sentencing, the trial court ordered defendant "submit to a blood test pursuant to section 1202.1." The parties agree, as do we, this order must be reversed.

Involuntary AIDS/human immunodeficiency virus (HIV) testing is strictly limited by statute. (*People v. Butler* (2003) 31 Cal.4th 1119, 1123; *People v. Guardado* (1995) 40 Cal.App.4th 757, 763.) Section 1202.1 provides the court shall order a defendant convicted of certain sexual offenses to be tested for AIDS. (§ 1202.1, subd. (a).) The statute specifies which sexual offenses require testing. (§ 1202.1, subd. (e).)

Defendant was convicted of violating section 288.7, which is not one of the enumerated offenses. Therefore, the court's order for HIV/AIDS testing was erroneous and should be stricken. (See *People v. Green* (1996) 50 Cal.App.4th 1076, 1090.)

**V.      Clerical Errors in the Abstract of Judgment and Sentencing Minute Order**

The defendant requests correction of several errors in the abstract of judgment and sentencing minute order.  The People concede these errors should be corrected.

"[A] court has the inherent power to correct clerical errors in its records so as to make these records reflect the true facts."  (*In re Candelario* (1970) 3 Cal.3d 702, 705; accord, *Pettigrew v. Grand Rent-A-Car* (1984) 154 Cal.App.3d 204, 209 ["The power of a court to correct clerical mistakes in its judgments is also an inherent power"].)

First, defendant claims the abstract of judgment lists the offenses as having occurred in 2020 when they actually occurred in 2019.  Testimonial evidence demonstrates the offenses took place in 2019.  Therefore, in item No. 1 of the abstract of judgment, the section labeled "Year Crime Committed" is ordered to be corrected by the trial court to reflect 2019.

Second, both the abstract of judgment and the sentencing minute order dated January 19, 2021, state defendant was convicted in count 3 of violating section 288.5, subdivision (a) when he was actually charged and convicted in count 3 of violating section 288.7, subdivision (b).  Further, the description of the offense is correct on the abstract of judgment but erroneous on the sentencing minute order.  Therefore, the abstract of judgment and sentencing minute order should be corrected to properly reflect defendant was convicted in count 3 of oral copulation or sexual penetration with a child 10 years of age or younger in violation of section 288.7, subdivision (b).  And page 2 of the minute order dated January 19, 2021, should be corrected to state that count 1 is for sexual penetration of a child 10 years or younger and count 3 is for oral copulation with a child 10 years or younger.

Last, defendant contends the abstract of judgment should be modified to reflect the court struck rather than imposed the $40 security fee and the $30 criminal conviction assessment.  At sentencing, the trial court struck these fees and fines because defendant did not have the ability to pay them.  As such, the abstract of judgment and the minutes

41.

should be corrected to reflect the trial court struck the $40 court security fee and a $30 criminal conviction assessment.

## DISPOSITION

Consistent with our discussion above, the trial court is directed to correct the abstract of judgment and minute orders, and to strike the AIDS testing order. In all other respects, the judgment is affirmed.

PEÑA, Acting P. J.

WE CONCUR:

SMITH, J.

DE SANTOS, J.